**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

RANDY FERRELL; ANA FRYE; and
DANIEL ZEPEDA, individually and on
behalf of all other similarly situated
individuals,

      Plaintiffs,

v.

CAPITAL ONE, N.A.,

      Defendant.

Civil Action No. 1:25-cv-00091

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 3

    A.    Capital One's Deposit Account Agreements. ......................................... 3

    B.    After the Service Outage, Capital One Promptly Notifies Affected
         Customers and Implements a Comprehensive Remediation Program.................. 4

    C.    Plaintiffs Allege a Brief Delay in Deposits that Capital One Processes................ 6

    D.    Plaintiffs' Lawsuits. ............................................................................. 8

ARGUMENT .................................................................................................................. 9

I.    This Court Lacks Subject-Matter Jurisdiction Over This Case. ......................... 9

    A.    Plaintiffs Lack Article III Standing to Pursue their Claims................... 9

    B.    Plaintiffs' Claims Are Moot........................................................... 13

II.    The Complaint Fails to State a Viable Claim. .................................................. 16

    A.    The Breach-Of-Contract Claim Should Be Dismissed. ...................... 16

    B.    The Negligence Claim Should Be Dismissed...................................... 20

    C.    The Conversion Claim Should Be Dismissed..................................... 22

    D.    The Unjust Enrichment Claim Should Be Dismissed.......................... 22

    E.    The California CLRA And UCL Claims Should Be Dismissed.......................... 24

III.    The Parties' Agreement Independently Bars any Viable Claims Plaintiffs May
      Have. ...................................................................................................... 27

CONCLUSION................................................................................................................ 28

## INTRODUCTION

In January 2025, Capital One experienced a service outage due to "a power disruption and coincident hardware failure at Fidelity Information Services, a Capital One service provider," which temporarily impacted certain services for some of Capital One's customers. Con. Am. Compl., ECF No. 33 ("CAC" or "Complaint") ¶ 14. The outage was resolved, and the majority of delayed transactions were processed within three days. Shortly thereafter, Capital One implemented a comprehensive plan to remediate impacted customers, which included waiving fees that may have otherwise been charged on Capital One accounts. Capital One also invited customers to contact the bank regarding reimbursement of fees they may have been charged by third parties related to the service outage.

Plaintiffs Randy Ferrell, Ana Frye, and Daniel Zepeda are Capital One customers who claim they experienced a delayed transaction. No one disputes that Capital One notified Plaintiffs about the service outage and the possibility that their transactions would be delayed. Nor is there any dispute that the bank processed their transactions, in some cases on the same or next day after Plaintiffs say they were due. And the only Plaintiff the Complaint alleges may have suffered any real-world harm—Ms. Frye—has already been reimbursed hundreds of dollars in fees that she claims she was assessed by third parties as late fees for payments delayed by the service outage.

Plaintiffs nevertheless filed this lawsuit seeking damages based on a theory that their "contracts" with Capital One "promised" uninterrupted and immediate "access to their funds," CAC ¶ 88, including during the unexpected outage that occurred here. But no such promise was made.

Even if Plaintiffs' claims had merit—they don't—there is nothing left to litigate. Capital One has already processed the transactions that Plaintiffs contend were delayed, credited interest for any delayed transactions, and invited Plaintiffs to contact the bank to address any fees they

might have incurred as a result of the service outage.  As Ms. Frye's experience demonstrates, this was not an empty invitation:  Capital One reimbursed Ms. Frye more than a dozen late fees.

This Court should therefore dismiss this case for two primary reasons.  *First*, the Court should dismiss the Complaint for lack of Article III standing because Plaintiffs fail to demonstrate "any actual or imminent injury."  *Pequignot v. Solo Cup Co.*, 640 F. Supp. 2d 714, 719 (E.D. Va. 2009) (Brinkema, J.).  Plaintiffs' claims each depend on the allegation that a delayed transaction left them temporarily "unable to access their funds."  CAC ¶ 3.  But Capital One's records—which may be considered in connection with Capital One's challenge to this Court's subject-matter jurisdiction—confirm that the bank has already reimbursed the only Plaintiff (Ms. Frye) who allegedly incurred fees in connection with her inability to access those funds.  Decl. of Melanie Roller ("Roller Decl.") ¶¶ 14–31, Exhibits G–L.  And even if the other Plaintiffs (Mr. Ferrell and Mr. Zepeda) had identified an injury at the outset of the litigation, they can no longer claim any injury today because Capital One has now implemented a comprehensive remediation program, rendering their claims moot.

*Second*, the Complaint should be dismissed because Plaintiffs fail to state any viable claim. The breach-of-contract claim fails because Plaintiffs cannot identify any contractual obligation requiring Capital One to provide uninterrupted and immediate access to account funds.  Plaintiffs' account agreements say exactly the opposite:  that Capital One "may" experience "problems related to [its] Services" that "may result in interrupted service, delays, or errors in the Services." Roller Decl. Exs. D, E, & F.  Plaintiffs' remaining claims for negligence and conversion fare no better because they are nothing more than a repackaging of their deficient contract claim.  This is fatal to Plaintiffs' tort claims because "the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract."  *Tingler*

2

*v. Graystone Homes, Inc.,* 834 S.E.2d 244, 255 (Va. 2019). Plaintiffs allege no such non-contractual duty here. As to the California-law claims, those laws are inapplicable to the circumstances alleged here, and Plaintiffs fail to meet the threshold requirements of Rule 9(b) in that they lack any specificity about the alleged fraud. And apart from these defects, the plain language of Plaintiffs' account agreements with Capital One bars liability for the unexpected service outage that occurred here.

For these and the additional reasons set forth below, the Court should dismiss the Complaint.

## BACKGROUND

### A.    Capital One's Deposit Account Agreements.

Capital One, N.A.[1] offers checking and savings accounts to consumers, who may access their accounts through Capital One's online bank website. *See* CAC ¶¶ 8, 31, 64. Consumer bank accounts are governed by account agreements, *see* CAC ¶¶ 16, 84, the terms of which are set forth in the Online Banking Terms & Conditions (the "Online Banking Terms"), and, depending on the type of account, the 360 Checking Account Disclosures (the "Checking Disclosures") or the 360 Performance Savings Account Disclosures (the "Savings Disclosures"). Roller Decl. ¶ 16.[2]

---

[1] Plaintiffs appear to improperly name as defendants Capital One Financial Corporation, a bank holding company that does not offer deposit accounts, and Capital One Bank (USA), N.A., CAC at 1, which no longer exists after merging with Capital One, N.A. in 2022. The proper defendant is Capital One, N.A., which is the sole defendant listed in the Complaint's caption.

[2] Because the Complaint references Plaintiffs' account agreements, *see* CAC ¶ 84, they are incorporated by reference into the Complaint and may be considered in ruling on a motion to dismiss. *See U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (court may consider "documents incorporated into the complaint by reference" in ruling on Rule 12(b)(6) motion); *NAC Consulting, LLC*, 650 F. Supp. 3d at 446 (considering contracts "integral to the complaint" under incorporation-by-reference doctrine in ruling on Rule 12(b)(6) motion).

The Online Banking Terms advise customers, in bold font, about the possibility of "**Interruptions in Service**." Roller Decl. Ex. F at 22. In that section, the Online Banking Terms state that "[t]he Service is generally available 7 days a week, 24 hours a day." *Id*. However, the Online Banking Terms also specifically advise customers that Capital One "may from time to time . . . experience . . . problems related to the Services. This may result in interrupted service, delays or errors in the Service." *Id*. Other portions of the Online Banking Terms confirm that the bank's services may be interrupted or delayed. For example, Capital One "MAKES NO WARRANTY THAT . . . THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE." *Id.* at 30.

With respect to the availability of funds, in particular, the Checking and Savings Disclosures inform customers that "funds will be available according to the Deposit Availability Disclosure section of this agreement," Roller Ex. D at 6, and "the Availability of Deposits section of this agreement," *id.* Ex. E at 3, respectively. The first sentence of those sections each states: "When a deposit is made to your account, the funds may not be available immediately." *Id.* Ex. D at 20; Ex. E at 7. Although the Disclosures state the bank's general policy that "Electronic direct deposits" and "Wire Transfers" will be available on "[t]he same business day," the Disclosures nonetheless advise customers that "Longer delays may apply." *Id.* Ex. D at 22; Ex. E at 9. The Disclosures provide as an example, that customers may experience delays accessing their funds when "[t]here is an emergency, such as failure of computer or communications equipment." *Id*. Ex. D at 22.

### B. After the Service Outage, Capital One Promptly Notifies Affected Customers and Implements a Comprehensive Remediation Program.

On January 15, 2025, Capital One began experiencing a service outage "caused by a power disruption and coincident hardware failure at Fidelity Information Services, a Capital One service

provider." CAC ¶¶ 12, 14. The outage left some "banking customers unable to access their bank accounts, process payments, or receive direct deposits," *id.* ¶ 12, until the issue was resolved a few days later on January 19, 2025. Roller Decl. ¶ 7 & Ex. B.

Capital One promptly "notified" affected customers "via email" about the "system issue affecting deposits, payments, and transfers." CAC ¶ 20; *see* Roller Decl. ¶ 6 & Ex. A. In that January 16 email, Capital One "assure[d] [customers] that we are taking this event very seriously" and "[w]e're working closely with our provider to resolve this issue and restore processing [of transactions] as quickly as possible." *Id.* Ex. A. Based on the information available at that time, Capital One informed customers that the bank "expect[s] services to gradually begin to return to normal throughout today and the majority of issues to be resolved by [the following] morning." *Id.* "Once the systems are restored," Capital One invited customers to contact the bank "for additional servicing assistance." *Id.*

Recognizing the outage's impact on affected customers, Capital One promptly implemented a comprehensive remediation program, including for its consumer banking customers. Roller Decl. ¶ 8. On January 21, 2025, Capital One sent an email notifying those customers about its remediation efforts. *Id.* ¶ 9 & Ex. C. Under the heading, "**What we are doing**," the bank explained, "Capital One is in the process of refunding late fees related to Capital One branded accounts that may have been impacted by the outage. You do not need to take any additional action for this reimbursement." Roller Decl. ¶ 10 & Ex. C (emphasis in original). Capital One also credited accounts for interest they would have earned on funds that would have been deposited in customers' accounts but for the delays caused by the service outage. *Id.* ¶ 11.

If customers had other losses, such as fees charged by third parties as a result of payments that were not made from a Capital One bank account, Capital One invited them to contact the bank

to discuss the issue further. *Id.* ¶ 12. For example, in the same January 21, 2025, email to consumer banking customers, Capital One explained under the heading, "**What we need your help to do**," "We understand there may be late fees or other fees you have been charged by businesses other than Capital One as a direct result of this system outage. If you experienced these fees as a result of this event, please reach out to us." *Id.* & Ex. C. If a customer contacted Capital One and claimed that they incurred late fees or other fees charged by third parties as a result of the service outage, it was Capital One's policy to reimburse those fees. In certain instances, depending on the amount of fees for which reimbursement was requested, Capital One may have requested supporting documentation. Capital One's policy was overinclusive, and may have resulted in Capital One reimbursing fees that were not in fact incurred as a result of the service outage. *Id.* ¶ 12.

### C. Plaintiffs Allege a Brief Delay in Deposits that Capital One Processes.

Plaintiffs are Capital One customers who maintain Capital One 360 Checking accounts (all Plaintiffs) or Capital One 360 Performance Savings accounts (Mr. Zepeda). CAC ¶¶ 29, 41, 60. Plaintiffs each allege that they are among the customers who experienced a delayed deposit transaction during the service outage. *Id.* ¶¶ 33, 44, 64.

Two of the Plaintiffs, Mr. Ferrell and Ms. Frye, allege that the service outage "delayed" a "paycheck deposit" to their Capital One checking accounts that they expected on January 17. CAC ¶ 44, 33. Specifically, Mr. Ferrell alleges that he "expected" his $628.73 paycheck "direct deposit from his employer" on that date, but he alleges that it "had not gone through" on January 17, based on a screenshot in the Complaint allegedly showing his account balance in the Capital One mobile app as of "7:12." *Id.* ¶¶ 31–33. Ms. Frye similarly alleges that her "paycheck deposit, scheduled for January 17," was "delayed," *id.* ¶ 44, and that she "was also unable to access her account or pay bills." *Id.* ¶ 46.

The remaining Plaintiff, Mr. Zepeda, alleges a delay in the deposit of "wired" funds to his Capital One savings account that he "expected . . . to be available on the same business day, either January 13, or January 14 at the latest."  CAC ¶ 62, 63.  Specifically, Mr. Zepeda alleges that on January 13, he "wire transferred $280 from his Wells Fargo account to his Capital One 360 Performance Savings account," *id.* ¶ 62, and that Capital One made a "promise in its Disclosures that it would make his wired funds available the same day of the deposit."  *Id.* ¶ 64.  On January 16, Mr. Zepeda alleges that he "attempted to access his online Capital One account to check his balance," but that he "was unable to do so."  *Id.* ¶ 64.

No Plaintiff alleges that they incurred any fees charged by Capital One arising from the alleged delay in the availability of their deposits.  Ms. Frye is the only Plaintiff who alleges that she incurred "late fees" charged by third parties "caused by Capital One's late processing of her deposit," CAC ¶ 56, which had been "scheduled for January 17," *id.* ¶ 44, and processed the next day, Roller Decl. ¶ 24.  Ms. Frye experienced only five withdrawal transactions that were rejected during the one day her deposit was delayed, and she otherwise made eighteen successful purchase or withdrawal transactions during the approximately five-day period of the outage.  Roller Decl. Ex. H.  Before she joined this case as a plaintiff, Capital One had nevertheless granted Ms. Frye's request to reimburse thirteen separate late fees, totaling $417.30.  Roller Decl. ¶ 25 & Ex. H, I, K.  More recently, Capital One reevaluated and granted Ms. Frye's request to reimburse an additional five late fees, totaling $187, and credited her account the same day, after concluding that these fees were eligible for reimbursement under Capital One's broad remediation program.  Roller Decl. ¶ 25.  The approval of Ms. Frye's request simply reflects that Ms. Frye was entitled to reimbursement of these fees under Capital One's broad remediation program, and does not reflect Capital One's conclusion that these fees were incurred as a result of the service outage.

### D.      Plaintiffs' Lawsuits.

In January 2025, within days of the service outage, Mr. Ferrell and Mr. Zepeda filed separate lawsuits seeking damages arising from their allegedly delayed deposits.  After Capital One filed motions to dismiss Mr. Ferrell's and Mr. Zepeda's complaints, the Court granted the parties' stipulation to consolidate the two actions.  ECF No. 29.  Mr. Ferrell and Mr. Zepeda then filed the operative Consolidated Amended Complaint ("CAC" or "Complaint") on April 30, which added additional Plaintiff Ms. Frye.  ECF No. 33.

Plaintiffs' lawsuit is based on the premise that their "contract" with Capital One "promised" to provide uninterrupted and immediate "access to their funds."  CAC ¶ 88.  The only contracts Plaintiffs identify are the Checking and Savings Disclosures, which they allege contain a provision requiring Capital One to make "electronic direct deposits" and "wire transfer[s]" available on "the same business day" that the transaction is initiated.  CAC ¶ 16.  However, the Disclosures both explain that "Longer delays may apply."  Roller Decl. Ex. D at 22; Ex. E at 9. The Complaint does not—and cannot—cite any other provision in any Capital One account agreement that promised uninterrupted access to the funds deposited in Plaintiffs' Capital One bank accounts.  To the contrary, the Online Banking Terms and the Disclosures acknowledge that customers may experience interruptions in service like the unplanned service outage that occurred here.  *See, e.g.*, Roller Decl. Ex. F at 22.

Plaintiffs nevertheless allege that by "denying . . . access to their funds" during the service outage, Capital One "breached the terms of [their] contract."  CAC ¶ 88.  Plaintiffs also accuse Capital One of negligence, *id.* ¶¶ 91–98, conversion, *id.* ¶¶ 99–104, unjust enrichment, *id.* ¶¶ 105– 113, and violations of California's CLRA and UCL, *id.* ¶¶ 114–127, based on the same alleged "fail[ure] to provide customers access to their Capital One funds."  *Id.* ¶ 93.  Plaintiffs seek to assert these claims on behalf of a putative nationwide class and California subclass of consumers

"who held a Capital One account and were denied access to their accounts or funds starting January 15, 2025." *Id.* ¶ 72.

## ARGUMENT

### I.    This Court Lacks Subject-Matter Jurisdiction Over This Case.

A motion to dismiss for lack of subject-matter jurisdiction arises under Rule 12(b)(1). *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 748 (4th Cir. 2018) (affirming Rule 12(b)(1) dismissal of moot claims).  Under Article III of the Constitution, "federal courts may adjudicate only actual, ongoing cases or controversies."  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  For there to be a case or controversy, the plaintiff must have a "personal interest" in the outcome of the lawsuit, which "must exist at the commencement of the litigation (standing)" and "must continue throughout its existence (mootness)."  *Lebron v. Rumsfeld*, 670 F.3d 540, 561 (4th Cir. 2012).  "The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff."  *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009).  In deciding a Rule 12(b)(1) motion, the Court may "consider[] evidence outside the pleadings, such as affidavits."  *Id.*

### A.    Plaintiffs Lack Article III Standing to Pursue their Claims.

The "irreducible constitutional minimum" of Article III standing requires, among other things, an injury-in-fact. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  An injury-in-fact must be "concrete," meaning it must be "real and not abstract."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).  Here, Plaintiffs fail to plead a cognizable injury-in-fact attributable to the service outage and therefore cannot establish Article III standing.

Plaintiffs cannot establish standing based on the allegations that they did not receive "interest for Capital One's late transfer of deposits."  *Id.* ¶ 4.  Capital One's records confirm that the bank credited Plaintiffs any additional interest they would have been owed.  In the case of Mr.

Ferrell and Mr. Zepeda, their accounts received all applicable interest at the end of January. Capital One later determined that Ms. Frye was owed an additional $0.03 of interest, and it credited that interest to her account in February 2025, before she joined this lawsuit. Roller Decl. ¶ 26 & Ex. I.

Nor can Plaintiffs establish standing based on allegations that they temporarily "los[t] [the] use of money" in their accounts, CAC ¶¶ 38, 56, 67, because courts have repeatedly held that a temporary inability to access funds is not enough to establish an injury-in-fact for purposes of Article III standing. *See, e.g.*, *Thompson v. Love's Travel Stops & Country Stores, Inc.*, 748 F. App'x 6, 9 (6th Cir. 2018) (affirming dismissal for lack of Article III standing of claims based on "temporary loss of credit and spending power" on a credit card account); *De Medicis v. Ally Bank*, 2024 WL 1257022, at *6 (S.D.N.Y. Mar. 25, 2024) (no Article III standing based on plaintiff's "temporary inability to access" his bank account); *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, at *8 (S.D.N.Y. May 7, 2019) (same); *Torres v. Wendy's Co.*, 195 F. Supp. 3d 1278, 1283 (M.D. Fla. 2016) (similar).

Nor did Plaintiffs incur any overdraft or other fees by Capital One during the service outage. Roller Decl. ¶¶ 20, 27, 31. Mr. Ferrell alleges that he incurred an "overdraft of his account" on January 17, 2025. CAC ¶ 34. In reality, Mr. Ferrell did not overdraw his account on January 17, Roller Decl. ¶ 19, but it would make no difference if he did. Capital One does not charge consumer customers overdraft fees or nonsufficient fund fees and has not done so since December 2021, when Capital One eliminated the practice of charging such fees for its consumer banking customers. *Id.* ¶ 13.

It also makes no difference that Plaintiffs also seek "nominal damages," CAC ¶¶ 40, 59, 70, which "fail to satisfy Article III's requirement of concrete harm." *Reimer v. LexisNexis Risk*

*Sols., Inc.*, 2022 WL 4227231, at *9 (E.D. Va. Sept. 13, 2022) (nominal damages "do not suffice for concrete harm").

As to all three plaintiffs, "[t]he fact that [this] case is brought as a class action adds nothing to the question of standing." *Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 156 n.4 (4th Cir. Mar. 4, 2025). A plaintiff who seeks to represent a class "must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Plaintiffs have not done so.

Plaintiffs' individual allegations provide additional reasons why they cannot establish Article III standing.

1.      Mr. Ferrell cannot establish that *he* temporarily lost access to *his* funds, even if that were otherwise sufficient for Article III standing (and it is not). Capital One's records confirm that Mr. Ferrell made four different purchase or withdrawal transactions beginning on January 15, 2025, and continuing until the service outage was resolved on January 19, 2025. Roller Decl. ¶ 18 & Ex. G (showing purchase and withdrawal transactions on January 15 and 18). To be sure, Mr. Ferrell alleges that his "direct deposit from his employer" for $628.73 "had not gone through" on January 17, based on a screenshot of his alleged account balance in the Capital One mobile app as of "7:12," CAC ¶¶ 31–33, but Capital One's records refute that allegation: Mr. Ferrell's January 2025 account statement shows that his direct deposit of $628.73 was posted to his account on January 17, Roller Decl. ¶ 19 & Ex. G, the same day Mr. Ferrell allegedly "expected his account to reflect his most recent paycheck." CAC ¶ 32. Thus, Mr. Ferrell "lacks standing to sue [Capital One] because he fails to allege any actual or imminent injury to himself." *Pequignot*, 640 F. Supp. 2d at 719.

2.      Mr. Zepeda's allegation that he had "no access" to "the funds he had transferred from his Wells Fargo account for several days," CAC ¶ 64, is deficient for yet another reason:  he fails to allege that he attempted any withdrawal or transaction that was prevented by the outage. "Conclusory allegations that the plaintiff was deprived of the use of [] funds and is entitled to be compensated for the lost use of funds are not sufficient to establish injury in fact even at the motion to dismiss stage."  *Dress v. Capital One Bank (USA), N.A.*, 2019 WL 3451304, at *3 (E.D. Va. July 30, 2019) (cleaned up), *aff'd*, 849 F. App'x 55 (4th Cir. 2021).  In any event, even assuming Capital One was obligated to make "wired funds available the same day of the deposit," CAC ¶ 64, no such obligation applied to Mr. Zepeda's transfer, which was an ACH deposit, not a wire transfer.  Roller Decl. ¶ 29.

3.      Ms. Frye alleges that she was "damaged in the amount of unreimbursed late fees caused by Capital One's late processing of her deposit," CAC ¶ 56, which was "scheduled for January 17, 2025," CAC ¶ 44, and processed the next day, Roller Decl. ¶ 24.  Capital One's records refute this allegation:  only five of Ms. Frye's withdrawal transactions were rejected during the service outage.  Roller Ex. H.  By the time Ms. Frye brought her claims in this lawsuit on April 30, Capital One nonetheless reimbursed Ms. Frye for *thirteen* late fees, totaling $417.30, as part of Capital One's broad remediation program to address fees consumers might have incurred as a result of the service outage.  Roller Decl. ¶ 25 & Exs. H, I, K.  Ms. Frye therefore cannot establish standing based on any late fees attributable to the service outage.  *Penegar v. Liberty Mut. Ins. Co.*, 115 F.4th 294, 304 (4th Cir. 2024) (affirming dismissal for lack of Article III standing because defendant "reimburse[d]" plaintiff for the alleged expenses incurred); *see Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) (standing of later-added plaintiff determined as of the filing date for amended complaint adding plaintiff).

Although Ms. Frye alleges that she incurred an additional $187 in late fees, she pleads no facts in support of her conclusory allegation that these fees were "charged due to Capital One's system outage," CAC ¶ 54, as opposed to some other reason (such as a failure to make timely payments). Capital One's recent decision to reimburse these additional fees after Ms. Frye brought her claims, Roller Decl. ¶ 25—and which otherwise moots her claims, *infra* at I.B.—simply reflects that Ms. Frye was entitled to reimbursement of these fees under Capital One's overinclusive remediation program, and does not reflect Capital One's conclusion that these fees were incurred as a result of the service outage, *see id.* ¶ 12. To the extent Ms. Frye alleges that she incurred these fees because she "was also unable to access her account" funds to "pay bills" at all, *id.* ¶ 46, that allegation is refuted by Capital One's records, which confirm that Ms. Frye made eighteen different purchase or withdrawal transactions from January 15 through January 19, 2025, when the service outage was resolved. Roller Decl. ¶ 23 & Ex. H. Accordingly, Ms. Frye has "failed to allege facts plausibly demonstrating that she has suffered a concrete and particularized injury in fact traceable to" any of Capital One's "challenged conduct," as Article III standing requires. *Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 153 (4th Cir. 2025) (affirming dismissal for lack of Article III standing in the absence of such factual allegations).

## B. Plaintiffs' Claims Are Moot.

Even if Plaintiffs suffered a cognizable injury at the outset of this litigation, Plaintiffs can no longer claim any injury today, making this case moot. A pending action is moot when "a change in the facts" after the commencement of a lawsuit creates a situation in which "the court cannot provide meaningful relief" to the plaintiff. *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015). Plaintiffs seek an order requiring Capital One (1) to cease "denying [consumer] account holders' access to their funds" CAC ¶ 2, and (2) to pay "restitution," "damages," "disgorgement," and "[i]nterest" resulting from any withholding of

customer funds, *id.* at ¶ 4.  Since Capital One has already done that—and more—for affected customers, Plaintiffs' claims are moot.

One day after this lawsuit was filed, Capital One publicly announced that "[a]ccount functionality for all customers" affected by the service outage "is now restored" and stated its "commit[ment] to making it right," inviting customers to "contact us for any support."  Roller Decl. ¶ 7 & Ex. B.  Capital One followed up with an email to consumers like Plaintiffs, acknowledging that Capital One "will continue to care for impacts you may have experienced as a result of this event."  Roller Decl. ¶ 10 & Ex. C.  Capital One explained that it intended to "refund[] late fees related to Capital One branded accounts that may have been impacted by the outage," and told consumers like Plaintiffs that they did "not need to take any additional action for this reimbursement."  *Id.*  Capital One also acknowledged that "there may be late fees or other fees you have been charged by businesses other than Capital One as a direct result of this system outage," and it encouraged consumers to contact Capital One.  *Id.* ¶ 12 & Ex. C.  And finally, for customers where there was a delay in depositing their funds, Capital One credited their accounts with interest in the amount these customers would have earned but for the delays caused by the service outage.  *Id.* ¶ 11.

Under the circumstances, there is nothing left to litigate.  Capital One processed Plaintiffs' allegedly delayed deposits and did not charge them any fees in connection with the service outage. *Id.* ¶¶ 19-20, 24, 27, 29, 31.  Mr. Ferrell and Mr. Zepeda do not allege they incurred any additional fees charged by third parties, and Capital One has now reimbursed Ms. Frye for all of the $604.27 in late fees allegedly incurred as a result of the service outage.  Roller Decl. ¶ 25.  As a result, Plaintiffs' claims are moot.  *See, e.g.*, *Hadley v. Chrysler Grp., LLC*, 624 F. App'x 374, 375 (6th Cir. 2015) (affirming dismissal of claims as moot because defendant's recall program "promised

to make every effort to repair the defect" at issue "for free, as quickly as possible"); *Hamilton v. Gen. Mills, Inc.*, 2016 WL 4060310, at *4 (D. Or. July 27, 2016) (dismissing claims because defendant's product recall program "offered a full refund" mooting plaintiff's claim); *Tosh-Surryhne v. Abbott Laboratories Inc.*, 2011 WL 4500880, at *5 (E.D. Cal. Sept. 27, 2011) (same); *Vavak v. Abbott Laboratories*, Inc., 2011 WL 10550065, at *3 (C.D. Cal. June 17, 2011) (same).

Again, it makes no difference that Plaintiffs seek to represent a class. CAC ¶ 2. "When the claims of named plaintiffs become no longer justiciable before class certification, the purported class action must be dismissed as moot." *Boatright v. Aegis Def. Servs., LLC*, 938 F. Supp. 2d 602, 611 (E.D. Va. 2013); *see, e.g.*, *Grabarczyk v. Stein*, 2021 WL 5810501, at *2 (E.D.N.C. Dec. 7, 2021) (dismissing plaintiff's claim as moot in putative class action). And the ancillary relief Plaintiffs seek—punitive damages, attorneys' fees, and costs—is foreclosed under Virginia law and irrelevant to whether their claims are moot. *See Aukhert v. Pritt Inv. Partners, LLC*, 2024 WL 5410979, at *16 (E.D. Va. Dec. 16, 2024) (dismissing punitive damages claim because they are "not generally available in contract cases" or for derivative tort claims "based on the same conduct"); *S-1 v. Spangler*, 832 F.2d 294, 297 n.1 (4th Cir. 1987) ("a claim for costs and attorney's fees . . . does not avert mootness").

Even if Plaintiffs' claims are not constitutionally moot, Plaintiffs' claims should be dismissed "for prudential reasons" because they have already obtained "the ultimate object of th[is] action": access to their direct deposit funds and an available remediation program for any fees they incurred as a result of the service outage. *Id.* at 297 (affirming dismissal of "injunctive relief and declaratory relief" action where plaintiffs have already "obtained th[e] reimbursement" funds they primarily sought). As then-Judge Gorsuch explained in dismissing claims as prudentially moot, "if events so overtake a lawsuit that the anticipated benefits of a remedial decree no longer

justify the trouble of deciding the case on the merits, equity may demand not decision but dismissal." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012) (Gorsuch, J.). In sum, because there is no relief the Court could order that Plaintiffs have not already received, "prolonging the litigation any longer would itself be inequitable." *Id.* at 1210.

## II.    The Complaint Fails to State a Viable Claim.

Even if this Court had subject-matter jurisdiction over this case—and it does not—Plaintiffs' failure to state a claim independently warrants dismissal of the Complaint under Rule 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs cannot rely on "labels and conclusions or a formulaic recitation of the elements of a cause of action." *Chippari v. Brookfield Washington, LLC*, 2024 WL 3166878, at *5 (E.D. Va. June 25, 2024) (Brinkema, J.). In deciding a Rule 12(b)(6) motion, the Court may consider "documents incorporated into the complaint by reference," *U.S. ex rel. Oberg*, 745 F.3d at 136, including contracts "integral to the complaint" in "evaluating a motion to dismiss a contract dispute." *NAC Consulting, LLC*, 650 F. Supp. 3d at 446 (considering the contracts underlying breach of contract claim).

### A.    The Breach-Of-Contract Claim Should Be Dismissed.

"To survive a motion to dismiss, a breach of contract claim must allege both the existence of a contract and a breach of a specific provision of that contract." *Broyhill v. Bank of Am., N.A.*, 2010 WL 3937400, at *5 (E.D. Va. Oct. 6, 2010) (Brinkema, J.). Thus, "[t]o allege that the defendant failed to perform obligations imposed by the contract, plaintiff cannot rely upon conclusory statements but must identify which provisions imposed the purportedly breached obligation." *Compel v. Citi Mortg. Inc.*, 2005 WL 4904816, at *2 (E.D. Va. Feb. 23, 2005) (Brinkema, J.) (dismissing contract claim because plaintiff failed to allege "which contractual

provision or obligation was breached"); *see also Raja v. Specialized Loan Servicing, LLC*, 2024 WL 1201603, at * 6 (E.D. Va. Mar. 20, 2024) (dismissing contract claim where "the Complaint does not identify any specific provision that [defendants] purportedly violated").

In this case, Plaintiffs fail to identify a breach of any provision of their "contract" that they admit governs their relationship with Capital One, CAC ¶ 84.  Although Plaintiffs allege that Capital One was obligated to provide them uninterrupted and immediate "access to their funds," CAC ¶ 88, and that this obligation is in a "contract" with Capital One, *id.*, they "fail to provide said contract, and further fail to [] identify which provision of the alleged contract was breached." *White v. Trans Union LLC*, 2025 WL 409660, at *4 (E.D. Va. Feb. 5, 2025).  Under Virginia law, which governs Plaintiffs' contractual relationship with Capital One,[3] Plaintiffs' claim for breach of contract therefore fails for this reason alone.  *Id.* (dismissing contract claim against Capital One for these reasons).

Indeed, the possibility that Plaintiffs would be unable to immediately access certain alleged deposits was contemplated by their agreements with Capital One, including the Checking Disclosures and Online Banking Terms (all Plaintiffs) and the Savings Disclosures (Mr. Zepeda). Roller Decl. Exs. D–F.  Plaintiffs contend that the service disruption "delayed" access to the following deposits by "several days" (CAC ¶¶ 36, 44, 65, 86):  (i) Ms. Frye and Mr. Ferrell's "paycheck deposit[s]" to their checking accounts expected on January 17, *see id.* ¶¶ 31–32, 43–44, and (ii) Mr. Zepeda's "wire transfer[]" to his savings account on January 13, *id.* ¶ 62.  Based on

---

[3] The Disclosures state that "[y]our account is subject to . . . the laws of the state of Virginia," Roller Decl. Ex. D at 18 & Ex. E at 11, and the Online Banking Terms state that "Virginia law governs this Agreement without regard to its conflicts of law principles," *id.* Ex. F at 31.  *See, e.g.*, *In re Cap. One 360 Sav. Acct. Int. Rate Litig.*, 2024 WL 4753821, at *17 (E.D. Va. Nov. 12, 2024) (applying Virginia law to claim for breach of contract based on same governing law provision in Disclosures).

these allegations, Plaintiffs accuse Capital One of breaching a promise that "Electronic direct deposits" and "Wire Transfers" are "available on the same business day." *Id.* ¶ 86. Setting aside that Mr. Zepeda's transfer was actually an ACH transfer to which the quoted language does not apply, *supra* at 12, this theory fails because "it is premised on isolated terms and words and fails to consider the contract as a whole," *Allen v. Allen*, 789 S.E.2d 787, 792 (Va. App. 2016), which disclosed within the same section that "[l]onger delays may apply." Roller Decl. Ex. D at 22 (Checking Disclosure); *id.* Ex. E at 9 (Savings Disclosure). Contrary to Plaintiffs' suggestion, nothing in this unqualified disclaimer is somehow limited "to deposit access by check." CAC ¶ 17.

Apparently recognizing that Capital One did not make an unqualified promise to make deposits available the same day, Plaintiffs focus on the following Capital One disclaimer, "If we are not going to make all of the funds from your deposit available to you as described above, we will notify you. We will also tell you when the funds will be available." CAC ¶ 17. As the Complaint acknowledges, however, Capital One did exactly that: The next day after the service disruption began on January 15, Capital One "notified them via email" about the service disruption, CAC ¶ 20, explaining that the disruption "has delayed processing of some transactions" and that the bank "expect[s] . . . the majority of issues to be resolved by Friday morning [*i.e.*, January 17]." Roller Decl. Ex. A; *see* CAC ¶¶ 21–22, 64 (quoting the same email). Capital One kept Plaintiffs informed until the delays were fully resolved: Capital One provided a January 18 notice in Plaintiffs' online Capital One accounts that this disruption was still "impacting deposits," CAC ¶¶ 24, 36, 45, 65, and then followed up in a January 21 email to notify Plaintiffs that the disruption "[n]ow . . . has been resolved," Roller Decl. Ex. C; *see* CAC ¶ 27 (paraphrasing the same email).

18

To be sure, Ms. Frye and Mr. Zepeda allege that they were temporarily "unable" to "access [their] online Capital One account" due to the service disruption, CAC ¶¶ 46, 64, but this possibility likewise was contemplated in their relevant account agreement. The Online Banking Terms governing these Plaintiffs' "online account access" expressly disclosed that Capital One "may" experience "problems related to the Services" that "may result in interrupted service, delays, or errors in the Services." Roller Decl. Ex. F at 22. In fact, Capital One expressly disclaims that it "MAKES NO WARRANTY THAT . . . THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE." *Id.* at 30. Ms. Frye and Mr. Zepeda therefore cannot state a claim based on an obligation to provide uninterrupted service "in direct contradiction of the [contract's] plain language." *Temple Found., Inc. v. Focus SH Acquisitions, LLC*, 2023 WL 2385942, at *5 (Va. App. Mar. 7, 2023) (affirming dismissal of contract claim); *see also Roberts v. Weight Watchers Int'l, Inc.*, 712 F. App'x 57, 61 (2d Cir. 2017) (affirming dismissal of contract claim premised on allegedly "dysfunctional" website because defendant "did not warrant that its services would be uninterrupted or error-free").

No bank can guarantee uninterrupted services at all times, and Capital One did not do so here. An "expectation of perfect uninterrupted service at all times is unrealistic," particularly when, as here, the parties' contract "unambiguously disclaims any promise of continuous, uninterrupted service." *Von Nessi v. XM Satellite Radio Holdings, Inc.*, 2008 WL 4447115, at *3-4 (D.N.J. Sept. 26, 2008) (rejecting attempt to impose an extra-contractual duty on satellite provider to provide uninterrupted service). For these reasons, courts have refused to permit breach-of-contract claims arising out of temporary service outages to proceed where, as here, no "provision in [any] agreements" requires "uninterrupted access" to the defendant's service. *Chou v. Charles Schwab & Co.*, 2023 WL 2674367, at *1 (9th Cir. Mar. 29, 2023) (affirming dismissal of contract claim

19

arising out of temporary service disruption to online trading platform); *see also, e.g.*, *Whitesides v. E\*TRADE Sec., LLC*, 2021 WL 2590156, at \*3 (N.D. Cal. June 24, 2021) (similar); *Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 721-23 (Pa. Super. Ct. 1996) (dismissing contract claim arising out of temporary service disruption by a cable television provider). This Court should do the same.

### B.    The Negligence Claim Should Be Dismissed.

Plaintiffs next attempt to repackage their claim for breach of contract as a negligence claim based on the same alleged "fail[ure] to provide customers access to their Capital One funds." CAC ¶ 93. This claim should be dismissed because Plaintiffs fail to identify any specific, non-contractual duty owed to them by Capital One.

Virginia law recognizes a "source-of-duty rule" that "delineates the boundary between tort and contract claims" to protect against plaintiffs "turning every breach of contract into a tort." *Harrell v. DeLuca*, 97 F.4th 180, 189 (4th Cir. 2024) (applying Virginia law). This rule holds that, "in order to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 255 (Va. 2019). "In other words, if a duty arises solely from a contract, then the tort claims must be dismissed and the plaintiff must proceed on the contract claim alone." *McBride v. Tully Rinckey, PLLC*, 2012 WL 6582538, at \*3 (W.D. Va. Dec. 10, 2012).

This rule takes on special importance in this case because "[t]he relation between a bank and a depositor" like Capital One and Plaintiffs is "a pure contractual relation." *Deal's Adm'r v. Merchants & Mechanics Sav. Bank*, 91 S.E. 135, 135 (Va. 1917). For this reason, "[d]ealings between a bank and its customer generally do not allow for claims sounding in negligence." *Van Leer v. Deutsche Bank Sec., Inc.*, 479 F. App'x 475, 481 (4th Cir. 2012). As a result, courts

routinely dismiss depositors' tort claims against banks for failure to plead any independent common law duty. *See, e.g.*, *Jain v. Old Dominion Nat'l Bank*, 2021 WL 5003244, at *3 (E.D. Va. Jan. 12, 2021) (dismissing negligence and conversion claims against bank where customer failed to allege any "duty independent of the standard debtor-creditor relationship between a depositor and a bank"); *Matthews v. Bank of Am., N.A.*, 2006 WL 1720688, at *4 (E.D. Va. June 20, 2006) (similar).

The source-of-duty rule precludes Plaintiffs' claim here. According to Plaintiffs, the only "duties" Capital One allegedly owed were (i) "to use reasonable care to protect and secure customer funds" deposited into their accounts, including by "utiliz[ing] service providers with reliable systems," and (ii) to "provide access to those monies." CAC ¶¶ 92, 96. But neither duty arises from common law. "To the extent that [Capital One] assumed a duty to protect the plaintiff[s'] deposited currency, it did so . . . pursuant to the parties' Deposit Agreement." *Eke v. Bank of Am., N.A.*, 2009 WL 10688932, at *3 (E.D. Va. Nov. 12, 2009) (dismissing negligence claim against bank to the extent premised on alleged "duty to properly safeguard the plaintiff's deposited funds"). And the duty "to allow access to the funds in the accounts" likewise "arose only with the [parties'] contract." *Comeaux v. First Union Nat. Bank*, 55 Va. Cir. 181, 181 (Va. Cir. Ct. 2001) (dismissing negligence claim against bank premised on such a duty). Indeed, to argue otherwise would undercut Plaintiffs' position elsewhere that "access to their funds" is one of "the terms of th[e] contract" that Capital One allegedly breached. CAC ¶ 88.

Plaintiffs' negligence claim is independently barred under the "economic loss doctrine," which is "a remedy-specific application of the source-of-duty rule." *Tingler,* 834 S.E.2d 264. Under this doctrine, a party may not use tort claims to seek either "purely economic losses" or "damage to property that is the subject of [a] contract," which are "the particular province of the

law of contracts." *Id.* Here, Plaintiffs seek purely economic losses—specifically, unspecified "damage[s]" arising from the temporary inability to allegedly access or use funds during a service outage. CAC ¶ 98. Accordingly, the economic loss doctrine independently bars Plaintiffs' negligence claim. *Landfall Tr. LLC v. Fid. Nat'l Title Ins. Co.*, 647 F. Supp. 3d 464, 475 (E.D. Va. 2022) (dismissing negligence claim seeking purely economic losses arising from contractual obligation under "both the source-of-duty and economic loss rules").

### C. The Conversion Claim Should Be Dismissed.

Plaintiffs' conversion claim alleging that Capital One unlawfully converted their "deposited money," CAC ¶ 100, similarly fails for two independent reasons. *First*, Plaintiffs' conversion claim is barred under Virginia's source-of-duty rule for the same reasons as their negligence claim. *Size, Inc. v. Network Sols., Inc.*, 255 F. Supp. 2d 568, 574 (E.D. Va. 2003) (Brinkema, J.) (dismissing conversion and negligence claims asserting "nothing more than an allegation that the defendant negligently performed its contractual duties"); *Jain*, 2021 WL 5003244, at *3 (similar). *Second*, conversion requires "dominion wrongfully exerted over the property of another." *Fed. Ins. Co. v. Smith*, 63 F. App'x 630, 632 (4th Cir. 2003). However, under Virginia law, "[w]hen [Plaintiffs] deposited money into their [bank] account, the money became the property of the bank," which therefore "could not have wrongfully exercised power over another's goods." *Comeaux*, 55 Va. Cir. at 181 (dismissing conversion claim for this reason); *see also Arch Ins. Co. v. FVCbank*, 881 S.E.2d 785, 793 (Va. 2022) ("moneys deposited immediately become the property of the bank").

### D. The Unjust Enrichment Claim Should Be Dismissed.

Plaintiffs' claim alleging that Capital One was unjustly enriched when it temporarily held their funds during the service disruption likewise has multiple defects, any of which provides a basis for dismissal.

*First*, under Virginia law, "[a]n action for unjust enrichment . . . may not be brought in the face of an express contract." *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988). Since Plaintiffs admit that their "contract" with Capital One governs their bank accounts at issue here, CAC ¶ 84, and incorporate that allegation into their unjust enrichment claim, *id.* ¶ 105, Plaintiffs' unjust enrichment claim should be dismissed. *See Grenadier v. BWW L. Grp.*, 2015 WL 417839, at *9 (E.D. Va. Jan. 30, 2015) (Brinkema, J.) (dismissing unjust enrichment claim because of "express contracts" governing the parties' dispute); *see also Colonna's Shipyard, Inc. v. Coastal Cement Corp.*, 2023 WL 3321734, at *3 (E.D. Va. May 9, 2023) ("[T]he unjust enrichment claim must be dismissed in light of the express contract between the parties"); *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 810 (E.D. Va. 2017) (same).

*Second*, Plaintiffs allege that they "conferred a benefit on Capital One by permitting Capital One to hold their funds," CAC ¶ 107, but Plaintiffs fail to allege how any such benefit was unjust. As explained above, *supra* at II.A., the parties' contract expressly contemplated interruptions or delays in services, including the processing of transactions. As a result, even if Capital One were somehow "enriched" by allegedly temporarily holding Plaintiffs' funds, CAC ¶ 63, "it was not inequitable." *Jones v. Link*, 493 F. Supp. 2d 765, 773 (E.D. Va. 2007) (dismissing unjust enrichment claim where defendant's alleged conduct was "pursuant to the agreement between the parties"). Nor can Plaintiffs allege, for example, that Capital One "accepted any benefit without paying for its value," *Grenadier*, 2015 WL 417839, at *9, in light of Capital One's broad remediation program, which included crediting interest on deposits that posted late and waiving fees. Roller Decl. ¶ 21, 26, 30.

E.    **The California CLRA And UCL Claims Should Be Dismissed.**

Plaintiffs cannot save their Complaint by invoking California's Unfair Competition Law ("UCL") and Consumer Legal Remedies Act ("CLRA"), which fail for multiple independent reasons.

*First*, like their tort and unjust enrichment claims, Plaintiffs' UCL and CLRA claims assert the same theory asserted in support of their contract claim: that their account agreements obligated Capital One to "make" Plaintiffs' "Electronic direct deposits" and "Wire Transfers available on the same business day," CAC ¶ 116, and that Capital One breached that obligation when it "fail[ed] to deposit funds on time," *id.* ¶ 122.  But it is black-letter law that a mere "breach of contract claim cannot form the basis for a UCL claim," *Conder v. Home Sav. of Am.*, 680 F. Supp. 2d 1168, 1176 (C.D. Cal. 2010), or a CLRA claim, *Baba v. Hewlett-Packard Co.*, 2010 WL 2486353, at *4 (N.D. Cal. June 16, 2010).  "Otherwise, every garden-variety breach of contract claim . . . would double as a UCL claim" or a CLRA claim.  *See Rosell v. Wells Fargo Bank, N.A.*, 2014 WL 4063050, at *6 (N.D. Cal. Aug. 15, 2014).

For this reason, courts routinely dismiss UCL and CLRA claims where, as here, they are "predicated solely on rights emanating from the [parties'] Agreement."  *Nuvo Rsch. Inc. v. McGrath*, 2012 WL 1965870, at *6 (N.D. Cal. May 31, 2012) (dismissing UCL claim for this reason); *see also, e.g.*, *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008) (affirming dismissal of UCL claim premised on allegations that "merely" allege conduct "in breach of [the parties'] contracts"); *Dress*, 2019 WL 3451304 at *7 (same, collecting cases); *Forever 21, Inc. v. Nat'l Stores Inc.*, 2014 WL 722030, at *5 (C.D. Cal. Feb. 24, 2014) (dismissing UCL claim where "the allegations are merely a repackaged version of . . . [a] defective breach-of-contract claim"); *Rosell*, 2014 WL 4063050, at *6 (similar); *Baba*, 2010 WL 2486353, at *4 (dismissing

CLRA claim that "allege[s] little more than a breach of contract").  The same result is warranted here.

 *Second*, Plaintiffs' claim under the CLRA and UCL that Capital One acted fraudulently fails to comply with "Rule 9(b)'s heightened pleading standards," which "apply to claims for violations of the CLRA and UCL."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *see also Dress*, 2019 WL 3451304 at *7 (UCL claims based on "unfair competition and fraudulent and deceptive practices laws[] must satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements because they sound in fraud.").  To satisfy Rule 9(b), Plaintiffs must identify "the who, what, when, where, and how of the alleged fraud," *U.S. ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014), as well as "reasonable, detrimental reliance upon a misrepresentation."  *Xia Bi v. McAuliffe*, 927 F.3d 177, 184 (4th Cir. 2019).  Setting aside that Plaintiffs do not—and cannot—allege with particularity *what* is false or misleading about Capital One's representations about deposits, *see supra* at § II.A, Plaintiffs fail to plead reliance:  they do not plead any of the required facts about "[h]ow and whether" *they* "relied on a misstatement"— or whether they saw any misstatement at all.  *Xia Bi*, 927 F.3d at 184 (affirming dismissal on Rule 9(b) grounds); *see In re Arris Cable Modem Consumer Litig.*, 2018 WL 288085, at *9 (N.D. Cal. Jan. 4, 2018) (dismissing UCL and CLRA claims under Rule 9(b) for failure to allege "what specific representations [plaintiff] saw and relied upon").  And even if Plaintiffs had read the agreements and relied on them, because "the parties' agreements unambiguously gave Capital One the authority" to process Plaintiffs' transactions in the manner alleged, Plaintiffs have not "plausibly identified any false or misleading statements made by Capital One."  *Dress*, 2019 WL 3451304 at *7.

*Third*, Plaintiffs' CLRA claim independently fails because their bank accounts are not "a good or service" to which the CLRA applies. Cal. Civ. Code § 1770(a). The CLRA defines "goods" as certain "tangible chattels." *Id. id.* § 1761(a). The California Supreme Court has accordingly confirmed that "bank deposit accounts" like Plaintiffs' are not among the "goods" to which the CLRA applies because they are "intangible goods." *Fairbanks v. Superior Ct.*, 205 P.3d 201, 206 (Cal. 2009). Nor could Plaintiffs "us[e] the existence of [any] ancillary services," such as direct deposit or wire transfer services, "to bring intangible goods within the coverage of the Consumers Legal Remedies Act," which "would defeat the apparent legislative intent in limiting the definition of 'goods' to include only 'tangible chattels.'" *Id.*; *see Hughes v. Wells Fargo Bank*, 2010 WL 11549573, at *3 (C.D. Cal. Apr. 26, 2010) (dismissing CLRA claim because "ancillary services" provided in connection with bank accounts "are not governed by the CLRA").

*Finally*, Plaintiffs' claims under the UCL's "unlawful" and "unfair" prongs fail for independent reasons as well. Plaintiffs purport to borrow the CLRA as a predicate for their claim under the "unlawful" prong of the UCL, CAC ¶ 123, which "borrows" and makes independently actionable violations of certain other laws. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539-540 (Cal. 1999). As explained above, the CLRA is inapplicable; thus, Plaintiffs "cannot state a claim under the borrowed law" and so they "cannot state a UCL claim either." *Marques v. Fed. Home Loan Mortg. Corp.*, 2013 WL 1932920, at *6 (S.D. Cal. May 8, 2013). Moreover, Plaintiffs' claim under the "unfair" prong of the UCL is based on the same conduct that allegedly "violated each of th[e] statute's [other] prongs," CAC ¶ 122, and it thus fails for the same reasons claims under those other prongs cannot be sustained. *Sidhu v. Bayer Healthcare Pharms. Inc.*, 2022 WL 17170159, at *9 (N.D. Cal. Nov. 22, 2022) (dismissing "unfair" prong claim "based on the same conduct underlying the other two UCL claims").

III.    **The Parties' Agreement Independently Bars any Viable Claims Plaintiffs May Have.**

Plaintiffs' claims, even if sufficiently pleaded—and they are not—should be dismissed because the plain language of their contracts with Capital One bars liability for the unplanned service outage that occurred here.

"Virginia courts regularly enforce exculpatory agreements," *Kocinec v. Public Storage, Inc.*, 489 F.Supp.2d 555, 558 (E.D. Va. 2007), including "limitations of liability in contracts." *Regency Photo & Video, Inc. v. Am. Online, Inc.*, 214 F. Supp. 2d 568, 573 (E.D. Va. 2002). "The rationale underlying the enforceability of exculpatory clauses is based upon the doctrine of freedom of contract—allowing parties to provide for the terms and conditions that govern their contractual relationship." *Total Tech. Sols., LLC v. ActioNet, Inc.*, 98 Va. Cir. 273 (Va. Cir. 2018). As a result, limitations of liability in contracts "will be enforced" so long as the clause "could be readily understood by a reasonable person in the plaintiff's position" and "clearly and unequivocally releases the defendant from precisely the type of liability alleged." *Kocinec*, 489 F.Supp.2d at 559; *Celebrate Virginia S. Holding Co., LLC v. CVAS Prop. Mgmt., LLC*, 2022 WL 1143526, at *7–8 (E.D. Va. Apr. 18, 2022) (enforcing "clear and definite" limitation-of-liability provision to dismiss contract and tort claims).

In this case, the limitation-of-liability provisions in Plaintiffs' account agreements "could readily be understood by a reasonable person" to "clearly and unequivocally" foreclose liability for the alleged service outage. Plaintiffs repeatedly agreed that Capital One "won't be responsible for any interruption in service or loss caused by an event that is beyond our control, including, but not limited to" events such as "computer failure" or "loss of power." Roller Decl. Ex. D (Checking Disclosures) at 19; *see also, e.g.*, *id.* Ex. E (Savings Disclosures) at 12 (similar); *id.* Ex. F (Online Banking Terms) at 31 ("WE ARE NOT LIABLE TO YOU FOR ANY INTERRUPTIONS OR

UNAVAILABILITY OF THE SERVICES.").  And Plaintiffs admit that the alleged service outage was not caused by anything Capital One did or controlled, but was instead because of "a power disruption and coincident hardware failure at Fidelity Information Services, a Capital One service provider."  CAC ¶ 14.

The narrow exception to enforcement of limitation-of-liability provisions that "contravene public policy," *Kocinec*, 489 F.Supp.2d at 559, does not apply here.  "[C]ourts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain." *Estes Exp. Lines, Inc. v. Chopper Exp., Inc.*, 273 Va. 358, 364 (Va. 2007).  Plaintiffs can point to no such illegality here that would require the Court to decline to enforce Capital One's disclaimer of liability for an emergency unexpected outage caused by a third-party vendor that was not within the bank's control.  *See Kocinec*, 489 F.Supp.2d at 560 (enforcing limitation-of-liability provision and finding "no reason, academic or practical, to foreclose the right of a private [entity] to contractually limit its liability as an appropriate or necessary business practice"); *Celebrate*, 2022 WL 1143526 at *7 (enforcing provision limiting liability for defendants who are "private entities").

## CONCLUSION

The Court should dismiss the Complaint for lack of subject matter jurisdiction or, alternatively, with prejudice for failure to state a claim.

DATED: May 21, 2025

Respectfully submitted,

By: _s/ Connor Kelley_

Connor Kelley (VA Bar No. 93596)
Andrew Soukup*
Jehan Patterson*
Samuel Greeley*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5606
Email: ckelley@cov.com
       asoukup@cov.com
       jpatterson@cov.com
       sgreeley@cov.com

Matthew Q. Verdin*
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: (415) 591-6000
Email: mverdin@cov.com

_Attorneys for Defendants Capital One Financial Corporation, Capital One, N.A., and Capital One Bank (USA), N.A._

_*Admitted pro hac vice_

29

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing (NEF) to all counsel of record.


By: *s/  Connor Kelley*

Connor Kelley